**SO ORDERED.**

**SIGNED this 31st day of January, 2019.**



_____
Robert E. Nugent
United States Bankruptcy Judge

---

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS

| | |
|---|---|
| IN RE:<br><br>ROSA LIDIA HERMOSILLO<br><br>       Debtors. | Case No. 18-10695<br>Chapter 7 |

## MEMORANDUM OPINION

Kansas law allows funeral homes to sell prepaid funeral services, but it also strictly regulates those sales. People may prearrange and pay for funeral services, but only by either paying money into trust accounts or assigning the funeral provider a life insurance policy in trust. When they die, the trust pays their previously agreed upon funeral expenses with the proceeds of the account or insurance policy. Kansas law exempts these "funds" from execution.

1

Section 522(b)(2) allows a Kansas debtor to claim property exempt if that property would be protected from execution or attachment under Kansas law. Rosa Hermosillo claimed her prearranged funeral agreement (PFA) exempt under KAN. STAT. ANN. §§ 60-2313(a)(10) and 16-310. These statutes protect "all funds … held in trust" under a PFA.[1] Because she funded the PFA by assigning a life insurance policy to the funeral home, the trustee objected to her exemption, arguing that § 16-310 only protects PFAs that are funded with bank accounts held in trust. Section 16-301 specifically authorizes the "funding" of a PFA by life insurance or cash deposits.[2] The policy is held in trust to pay the debtor's funeral expenses with the death benefit and is therefore an exempt "fund." The trustee's objection is overruled.[3]

Facts[4]

In February of 2018, Rosa Hermosillo signed a Pre-Need Funeral Agreement (the "PFA") with Carlson-Geisendorf Funeral Home ("Funeral Home") in Salina, Kansas.[5] The Funeral Home agreed to provide her with a prepaid funeral upon her death and to charge her $14,133.25.[6] The agreement is divided into two parts—guaranteed and non-guaranteed. The guaranteed price of $12,125 covers funeral

---

[1] KAN. STAT. ANN. §§ 60-2313(a)(10) and 16-310(d) (2005).
[2] KAN. STAT. ANN. §16-301 (2005).
[3] The Chapter 7 trustee J. Michael Morris appears on his own behalf. The debtor appears by her attorney Nicholas Grillot.
[4] This matter was submitted on stipulations of fact, Doc. 42, and the parties' briefs, Docs. 43, 45, and 49. No argument or trial was held. These findings of fact are based on the stipulations and the exhibits referenced therein, namely Exhs. 1 (Pre-Need Funeral Agreement), 2 (Insurance Enrollment), and 3 (Certificate of Insurance), separately filed as Doc. 44.
[5] Doc. 44, Ex. 1, pp.1-3.
[6] *Id.* at p. 1.

director services, embalming, visitation, funeral or memorial service, transportation, casket and vault. The balance of the PFA price is for services whose prices are not guaranteed, such as death certificates, honoraria for the minister and musicians, obituaries, grave opening, other services, and sales tax. The entire agreement covers everything but the purchase of a burial plot.

The PFA stated that it would "be funded by the assignment of insurance benefits," and Ms. Hermosillo agreed to assign the death benefits of an insurance policy issued by Homesteaders Life Company.[7] She applied for a group life insurance policy from Homesteaders and granted Homesteaders the immediate right to draw from her bank account $11,325.00, comprised of a $11,275.01 single premium life insurance rider having a face amount of $11,446.73, and the first $49.99 monthly premium for additional insurance in the face amount of $3,144.06 payable over 10 years.[8] Homesteaders issued the life insurance certificate (including the single premium whole life certificate rider) the same day debtor entered into the PFA.[9] As part of the PFA, she irrevocably assigned the right to receive the policy's death benefit to the Funeral Home.[10] The agreement recited that the irrevocable assignment deprived her of the rights to surrender the policy to obtain cash value, borrow on it, or receive a premium refund and removed the policy from her assets for qualifying for Medicaid or other public assistance.[11] The agreement's terms also provided that

---

[7] *Id* at pp. 1-2.
[8] *Id.* at pp. 3-6.
[9] *Id.* at pp. 7-23, specifically pp. 9, 19-21.
[10] *Id.* at pp. 1-2, 9.
[11] *Id.* at pp. 1-2.

3

when she assigned ownership of the Homesteaders policy to the Funeral Home, it then assigned the policy to the Funeral Assurance Trust.[12]

Rosa Hermosillo filed a Chapter 7 petition on April 20, 2018 and J. Michael Morris was appointed her case trustee. On amended Schedule C, Ms. Hermosillo exempted her "prearranged funeral agreement" with a value of $11,325, relying on KAN. STAT. ANN. § 60-2313(a)(10). The amount exempted is comprised of the initial premiums paid on February 13, 2018 at enrollment. While this amount far exceeds the current cash value of the policy, it is less than the value of the funeral services covered by the PFA and is less than the face amount of insurance purchased. The trustee objected to the exemption, contending that the PFA statutes, KAN. STAT. ANN. § 16-301, *et seq.*, do not exempt insurance policies that are assigned to fund the agreements.

<u>Analysis</u>

The trustee may object to a debtor's claimed exemption but has the burden of proving that the exemption was not properly claimed.[13] Though we deal with stipulated facts here, the trustee remains obligated to bring forward legal analysis that defeats the exemption. Debtors may exempt from the property of their estates those assets described in § 522. Kansas debtors are limited by § 522(b) to certain specific federal exemptions and those provided by Kansas state law. KAN. STAT. ANN. § 16-310(d) shields from execution or attachment by either a seller's or purchaser's

---

[12] *Id.* at p. 2. *See also* Insurance Certificate, Doc. 44, p. 9 indicating that ownership is irrevocably assigned.
[13] Fed. R. Bankr. P. 4003(c).

4

creditors ". . . all *funds* held in an account or trust established pursuant to a prearranged funeral agreement, plan or contract . . . ." That exemption is repeated in KAN. STAT. ANN. § 60-2313(a)(10) which protects from execution "any *funds* held in an account or trust established pursuant to a prearranged funeral agreement . . . pursuant to K.S.A. § 16-310 and amendments thereto."

The trustee objects that the debtor's insurance policy cannot be exempt under these two statutes because it is not held in trust. Rather, he argues, it supplies a separate means for the debtor to fund a PFA and that only "accounts or trusts," not insurance policies, are exempt under these two statutes.[14] The debtor argues that the life insurance policy is the "fund" that was ultimately placed in the Funeral Assurance Trust to pay her funeral expenses. The Legislature has authorized funeral providers to sell insurance as an alternative means of funding exempt PFAs.[15]

KAN. STAT. ANN. § 16-301 (2007) only authorizes PFAs that comply with the provisions of §§ 16-301, *et seq*. Non-complying PFAs violate public policy. Until 2002, § 16-301 only authorized PFAs to be funded with money deposited in insured deposit accounts in trust for the benefit of the purchaser. In 2002, the legislature added the last sentence of the current version of the section stating that "[t]his act shall not prohibit the funding of a prearranged funeral agreement with insurance proceeds derived from a policy issued by an insurance company authorized to conduct business

---

[14] Both parties agree that the life insurance exemption, KAN. STAT. ANN. § 40-414(a) (2000), does not apply here.
[15] KAN. STAT. ANN. § 74-1707 (2002).

5

in this state."[16] This was one of a series of amendments made to Chapter 16, Article 3 to enable the state to recoup excess PFA funds not spent by the funeral provider on the purchaser's funeral.[17] Funeral directors are required to report to the Kansas State Board of Mortuary Arts, all prefinanced funeral agreements funded by an insurance policy or held in trust, including the identity of the insurance company in which the funeral establishment has been designated as the beneficiary or assignee, or risk revocation of licensure.[18]

Section 16-311(a) also refers to funding PFAs with insurance and specifically provides for any excess funds to be paid to the state welfare department.[19] This section was later amended in 2004 to specifically refer to insurance companies or others that are "providing the services" not being liable to the welfare department for unused balances if they did not receive notice that the deceased had received state assistance.[20] It was amended again in 2014 to change the title of the welfare department from the Department of Social and Rehabilitation Services to the Department of Children and Families. The Legislature enacted § 16-312 in 2010, and as amended in 2014, stipulates that "any prearranged funeral agreement that

---

[16] § 16-301 (2007). *See* 2002 KAN. SESS. LAWS 460, ch. 106, § 1.
[17] 2002 KAN. SESS. LAWS 460, ch. 106 ("AN ACT concerning recipients of medicaid; after death requiring certain moneys to be recouped and repaid to the secretary of social and rehabilitation services; amending K.S.A. 16-301 and K.S.A. 2001 Supp. 16-304 and repealing the existing sections."). *See also*, KAN. STAT. ANN. § 16-311(a) (2007). replacing former § 16-304.
[18] KAN. ADMIN. REG. § 63-3-20 (2018).
[19] *See also* KAN. ADMIN. REG. § 63-3-21 (2018) referring to prefinanced funeral agreements funded by an insurance policy and implementing § 16-311.
[20] 2004 KAN. SESS. LAWS 149, ch. 36, § 2.

6

involves the payment of money or the purchase or assignment of an insurance policy or annuity" must be in writing and include a list of disclosures.[21]

At the same time, the Legislature enacted § 16-314 which states:

> For the purposes of this act, the term "prearranged funeral agreement" shall mean any agreement, contract or plan authorized by K.S.A. 16-301, and amendments thereto.[22]

That definition applies to the term "prearranged funeral agreement" that appears in both § 16-301(d) and § 60-2313(a)(10). Because § 16-301 authorizes PFAs to be funded with insurance policies, these exemptions protect the buyer's or beneficiary's interest in them. Insurance, therefore, plays a prominent role in PFAs under the current statutory scheme and is a critical component of the agreements the Court considers today.

Under Ms. Hermosillo's PFA agreement, she agreed to acquire and pay for a life insurance policy rider with a death benefit of $11,446.73 payable by a single premium of $11,275.01.[23] She agreed to acquire additional insurance of $3,144.06 payable to the funeral home over ten years at $49.99 per month.[24] She irrevocably assigned the insurance policy to the funeral home which, in turn, irrevocably assigned

---

[21] KAN. STAT. ANN. § 16-312 (2017 Supp.). The required disclosures for "insurance-funded preneed funeral agreement" were given to Ms. Hermosillo. Doc. 44, p. 6.
[22] KAN. STAT. ANN. § 16-314 (2017 Supp.).
[23] The insurance certificate states that "[t]he death benefit on the issue date is the face amount [$11,446.73]" shown on the schedule of insurance. Doc. 44, p. 21.
[24] For the multiple payment portion of the insurance policy, the death benefit payable is a percentage of the face amount of insurance for years 1 and 2 of premium payments and the full face amount of insurance for years 3 and after. Doc. 44, p. 4.

7

it to the Funeral Assurance Trust.[25] She initialed the "Medicaid Qualification" clause on the agreement. That made her otherwise revocable insurance assignment "irrevocable to qualify for Medicaid or other public assistance."[26] The clause also states that she waived her rights to cancel the policy or to receive a refund of what she paid.[27] Thus, she waived any right she may have had to reach the cash value of the policy.[28] Now, only the Trust can reach the cash value and recover the death benefit. When she dies, the Trust will be contractually obligated to use the insurance proceeds for Ms. Hermosillo's funeral expenses and services as outlined on the PFA.

If we read the sections of the statutory scheme together and assign the words their accepted meanings, irrevocably assigning an insurance policy to the funeral home in trust to fund the PFA equates to paying the funeral home money that it then deposits in a trust account. The word "funds," used repeatedly in these sections, including § 16-310(d), means more than money "and, in its broader meaning, may include property of every kind."[29] Though the property given by the debtor for the PFA—the assigned insurance policy—didn't come in the form of a bank deposit, it is

---

[25] Doc. 44, p. 2 (Medicaid Qualification/Irrevocability section). The insurance certificate states that "ownership [of the insurance policy] is irrevocably assigned," and the beneficiary is "as stated in the Enrollment Form [*i.e.* Funeral Home]." Doc. 44, p. 9.
[26] Doc. 44, p. 1.
[27] *Id.*
[28] *See also* Doc. 44, p. 2 – paragraph titled "Medicaid Qualification/Irrevocability."
[29] *State v. Finney*, 141 Kan. 12, 40 P.2d 411, 421 (1935) (quoting from 4 Words and Phrases, First Series, 3004 and citing *In re Tatum,* 70 N.Y.S 634, 635, 61 App. Div. 513 (1901)). *See also* 40 P. 2d at 421 quoting BLACK'S LAW DICTIONARY 828 (4th ed.) on the meaning of "funds" to include ". . . the proceeds of any other assets converted into money.

8

certainly a "fund" that a purchaser can use to buy a PFA.[30] It is an asset that represents the death benefit (money) payable upon the insured's death. It is commonly paid by a check that may be negotiated and deposited into an account. Making that policy or fund exempt protects a debtor's funeral and interment provisions from the debtor's creditors. That is consistent with exempting a Kansan's interest in a cemetery merchandise trust that is expressed in § 60-2313(a)(9).[31]

My interpretation of the PFA exemption is also consistent with long-standing Kansas Supreme Court precedent that exemption laws are to be liberally construed in favor of those intended to be benefitted and to effectuate the object and purpose of the exemption statute.[32] Section 16-301's purpose of requiring the "funds" to be held in trust was discussed in *Lakeview Gardens, Inc. v. State ex rel. Schneider*:

> The concern of the legislature expressed by this statute emanated from the possibility for fraud which can arise from sales of burial merchandise to young persons where the purchase price is collected long in advance of any actual need for such merchandise. Because of the time lag between the time of bargaining and the time of performance requiring delivery of the merchandise there are hazards not present in ordinary retail sales. Not only do such sales present opportunities for fraud and deceit but delivery of the merchandise may become impossible of performance when a seller has suffered economic woes and has gone out of business. The purpose of requiring that purchase price payments be held in trust is to assure those who purchase preneed caskets and burial merchandise that they will have either the benefit of their purchase, the merchandise, or their money back at the time the need for the merchandise occurs.[33]

---

[30] *See also Fund,* BLACK'S LAW DICTIONARY (10th ed. 2014) ("To furnish money to (an individual, entity, or venture), esp. to finance a particular project.").
[31] *See* KAN. STAT. ANN. § 60-2313(a)(9) exempting funds in cemetery merchandise trusts per KAN. STAT. ANN. § 16-328.
[32] *Miller v. Keeling,* 185 Kan. 623, 627, 347 P.2d 424 (1959) (citations omitted.).
[33] 221 Kan. 211, 215, 557 P.2d 1286 (1976).

9

The irrevocable assignment of ownership of the insurance policy by the Funeral Home to the trustees of the Funeral Assurance Trust ensures that the insurance policy and the "fund" that it represents, are held in trust and protects the purchaser from misuse of the insurance proceeds. It places insurance-funded PFAs on par with cash-funded PFAs. No sound reason exists for exempting one type of funded PFA, but not the other and the exemption statute itself contains no such language that would do that.

Section 16-310(d) prevents a creditor of either the purchaser or a seller of a PFA from reaching these funds. The debtor's interest in the PFA, including the "fund" available from the insurance policy's death benefit, is exempt. Because Ms. Hermosillo claimed an exemption of $11,325—an amount less than the $11,446 death benefit she fully funded by payment of a single premium life rider on February 13, 2018—her exemption is proper. The trustee's objection is overruled.

### #